IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:20-cr-00301-M-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **OPINION** |
| | ) | **AND ORDER** |
| MOHAMED MAGI ABUSNENA, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on Defendant's motion to suppress the evidence seized from his vehicle on the night of his arrest, which was filed on December 17, 2020. [DE-24] For the reasons that follow, Defendant's motion is GRANTED IN PART and DENIED IN PART.

**I.     Background**

The evidence presented by the parties, including both witness testimony and video evidence,[1] demonstrates the following: at approximately 2 A.M. on April 19, 2020, Officers Joshua Keeny and William Garrison of the Raleigh Police Department (the "RPD") were sitting in their respective patrol vehicles at Durant Road Elementary School in Northeast Raleigh when they heard a series of gunshots nearby to their location. [DE-37 at 5–6] The officers split up to canvass the area to find the source of the gunfire. [DE-37 at 6]

---

[1] At the February 23, 2021 hearing on Defendant's motion to suppress, Defendant played two segments of certain videos taken from the arresting officers' dashboard cameras on the night of Defendant's arrest. [DE-37 at 49] The parties thereafter agreed to have the Government submit all video evidence that was exchanged in discovery to the court for review. [DE-37 at 74] References within this opinion to particular videos will identify the officer and whether the camera was from his vehicle or his body-camera, as identified by the Government's submission. [DE-36]

1

Keeny did not initially encounter any individuals or vehicles. [DE-37 at 6, 18] At the time, North Carolina was under a strict lockdown since the Governor had issued a number of executive orders in response to the COVID-19 outbreak, including an order that directed people not to leave their homes except to visit essential businesses, exercise outdoors, or help family members.[2]

Five to ten minutes after his search began, Keeny was leaving the parking lot of nearby Abbotts Creek Elementary School, also in Northeast Raleigh, when he heard two more gunshots at a very close range. [DE-37 at 6] The gunfire sounded to Keeny like it came from the direction of the entrance of the school. [DE-37 at 6, 18, 36] Upon turning in the direction of the gunfire, Keeny immediately observed a vehicle 100 yards away making a rapid U-turn away from the school and towards Durant Road. [DE-37 at 6, 20; DE-24 at 2; DE-30 at 2] Keeny observed no other individuals or vehicles in the area. [DE-37 at 7]

Keeny began to pursue the vehicle, which began driving in excess of the speed limit westwards on Durant Road. [DE-37 at 7–9] Keeny began speeding himself to try to catch up to the vehicle, and he noted that the vehicle lacked an operative rear brake light. [DE-37 at 21–22, 32] Keeny believed that the vehicle was driving to evade him. [DE-37 at 9] Following a brief chase which veered off of Durant Road, Keeny pulled up behind the vehicle, which had stopped on a driveway in front of a house on Crofton Springs Drive. [DE-37 at 8–9] Keeny stopped his patrol vehicle on the street and activated his emergency lights. [DE-37 at 9–10] At that time: (1) Keeny had called for backup from other officers [DE-37 at 10]; (2) Keeny had not run the vehicle's license plate, and believed that the vehicle had pulled into the driveway at random in an attempt to evade him [DE-37 at 9]; and (3) no one had yet emerged from the vehicle [DE-36 (Keeny Vehicle)].

---

[2] *See* N.C. Exec. Order 121 (Mar. 27, 2020) (issuing statewide stay-at-home order) (available at https://governor.nc.gov/documents/executive-order-no-121 (last accessed Mar. 17, 2021)); [DE-37 at 16 (Keeny noting that "[t]his was during the pandemic lockdown.")]

Keeny got out of his patrol vehicle, and Defendant emerged from the driver's seat of the other vehicle. [DE-37 at 9–10; DE-36 (Keeny Vehicle)] Keeny approached Defendant and ordered him to place his hands onto his vehicle because he was concerned that Defendant could be armed based upon the gunfire that he had heard. [DE-37 at 10] Defendant refused to comply with Keeny's orders several times. [DE-37 at 10] Defendant also reached for his pocket, and Keeny ordered him not to do so, an order with which Defendant complied. [DE-37 at 11; DE-36 (Keeny Vehicle)]

Garrison and Officer Chad Warren, also of RPD, showed up on the scene less than a minute after Keeny, and the three officers placed Defendant under arrest for suspicion of: (1) discharging a firearm within Raleigh's city limits, a violation of Raleigh's Code of Ordinances § 13-2010(a); and (2) resisting, delaying, or obstructing a traffic stop, a violation of N.C. Gen. Stat. § 14-223. [DE-36 (Keeny Vehicle); DE-37 at 12] The officers secured Defendant in handcuffs and immediately began to survey the area for danger, including by shining flashlights into and around Defendant's vehicle. [DE-36 (Keeny Vehicle)] Garrison called in the vehicle's license-plate number and the house's address to dispatch. [DE-36 (Garrison Body)] As Keeny and Warren began to escort Defendant towards Keeny's patrol vehicle, Garrison told them to make sure that Defendant was unarmed while he continued surveying the area. [DE-36 (Garrison Body)] As Defendant was being secured in the back of Keeny's patrol vehicle, Garrison observed shell casings on the back seat of Defendant's vehicle through its window. [DE-36 (Garrison Body); DE-37 at 11–12] Once Defendant was secured, Garrison asked Keeny and Warren whether they were sure that Defendant was unarmed. [DE-36 (Garrison Body)]

Shortly thereafter, Garrison learned from dispatch that Defendant's vehicle was registered at the address at which they were located. [DE-36 (Garrison Body)] Garrison told Keeny and Warren that he believed that that fact "means we're at [Defendant's] house, which means somebody's watching us," and stated that they needed to ascertain whether anyone else was at the house. [DE-36 (Garrison Body)] Keeny

3

and Warren continued to survey the area, including by shining flashlights into the house's windows. [DE-36 (Warren Body)] Garrison approached the front door, observed that the lights were on, and began to knock. [DE-36 (Garrison Body)] Garrison also told Keeny and Warren not to enter the vehicle, explaining that Defendant was parked in his own driveway and stating that they did not "want to screw anything up." [DE-36 (Garrison Body)] As Garrison was knocking at the front door, Warren observed more shell casings in the front passenger area of Defendant's vehicle. [DE-36 (Warren Body); DE-37 at 41] Garrison knocked several more times, but no one came to the door, and Garrison called someone he called "Sarge" to discuss the situation. [DE-36 (Garrison Body)] Garrison asked whether a warrantless search of Defendant's vehicle was allowed since the vehicle was parked on Defendant's driveway, specifically mentioning "the *Carroll* doctrine" and "exigent circumstances." [DE-36 (Garrison Body)] Garrison appears to have received a response that no warrant would be necessary to search the vehicle under the circumstances. [DE-36 (Garrison Body)] While Garrison was on the phone, Warren was at Keeny's patrol vehicle speaking with Defendant. [DE-36 (Keeny Vehicle)] Defendant told Warren that the house was owned by his parents, that he lived there with his parents, and that no one was at home. [DE-36 (Keeny Vehicle)]

Captain Kelly Treuheart and Officer Jeffery Campbell, both of RPD, showed up on the scene at this time, and the five officers got together to discuss what had transpired and what to do. [DE-36 (Keeny Vehicle)] Garrison told the others that the house was probably where Defendant lived, and that "Sarge" had said he believed no warrant was necessary to search Defendant's vehicle because "we were right behind him[.]" [DE-36 (Garrison Body)] Treuheart, the watch commander on duty, then gave authorization for the officers to search the vehicle without a warrant because "you heard him and followed him here." [DE-36 (Garrison Body); DE-37 at 13, 30] As the officers prepared to search the vehicle: (1) Garrison asked the others to "keep an eye on the house" because "the lights are on and I can't get anybody to answer the door"

4

[DE-36 (Garrison Body)]; and (2) Defendant called Keeny over and told Keeny "I don't give y'all consent to search" [DE-36 (Keeny Vehicle)].

The officers then entered the passenger compartment of Defendant's vehicle and conducted a search, finding a loaded firearm, ammunition, and a number of spent shell casings. [DE-37 at 13, 42–43; DE-36 (Warren Body)] After that, the officers searched the trunk of the vehicle, and located various other evidence, including a box for a firearm and a notebook in which someone had written. [DE-36 (Keeny Vehicle); DE-24 at 4]

During the search, Sergeant Jonathon Mason of RPD arrived on the scene. [DE-37 at 51; DE-36 (Keeny Vehicle)] While the other officers searched the trunk, Mason went to Keeny's vehicle to speak with Defendant. [DE-36 (Keeny Vehicle)] Mason told Defendant that they had located a loaded firearm within his vehicle, and Defendant responded that "it's not stolen and it's not mine." [DE-36 (Keeny Vehicle)] Defendant also volunteered to Mason that he had a loaded firearm magazine within his pocket, which was retrieved and also placed into evidence. [DE-36 (Keeny Vehicle); DE-37 at 14–15] Approximately fifteen minutes thereafter, the officers left the scene, with Defendant in Keeny's patrol vehicle. [DE-36 (Keeny Vehicle)]

On June 24, 2020, Defendant was indicted by a federal grand jury for possessing a firearm while a convicted felon in violation of 18 U.S.C. § 922(g)(1). [DE-12] Following certain pretrial discovery, Defendant moved to suppress "all evidence seized from the vehicle driven by Defendant" on the night of his arrest, arguing that his rights under the Fourth Amendment to the United States Constitution had been violated by the search of his vehicle. [DE-24] After the parties fully briefed Defendant's motion, a hearing was held on February 23, 2021, at which the court took the matter under submission. [DE-37] This order follows.

5

## II.      Analysis

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. This generally requires law-enforcement officers to seek a warrant from an impartial judicial officer before searching "persons, houses, papers, [or] effects," and before seizing the fruits of such a search. *Id.* However, "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), since the Fourth Amendment prohibits only unreasonable searches and seizures. If a search falls within one of the historic exceptions to the warrant requirement, it is reasonable for Fourth Amendment purposes even when it is conducted without a warrant. One line of such exceptions concerns exigent circumstances. *See Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) ("warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment" (internal quotation marks and citations omitted)).

There is perhaps no aspect of American constitutional jurisprudence that is more widely litigated, and which has been and continues to be more frequently defined and redefined, as when a sufficiently-exigent circumstance exists justifying an exception to the warrant requirement. Justices and judges alike have written with greater conviction than clarity in applying the Fourth Amendment and attempting to strike the proper equilibrium between the countervailing interests that the Amendment balances: the people's interest in effective enforcement of the laws enacted by their representatives versus the people's interest in avoiding unwarranted intrusions into their privacy. The result is that in many cases the facts are such that several of the exceptions are potentially in play, and the exceptions and their justifications (and the cases

6

describing them) may both overlap and cut against each other, creating an analytical thicket that is extraordinarily difficult for law-enforcement officers and citizens (as well as the lawyers working with and for them) to understand.

This is such a case. The relevant facts and precedents both controlling and persuasive on this court, as described below, permit a relatively-straightforward path through the constitutional thicket, but they also raise considerations that potentially complicate the analysis. The court will first address the straightforward aspect of the analysis, which the court concludes controls the disposition of Defendant's motion, and will then discuss some of the potentially-complicating considerations raised by Defendant, which the court ultimately concludes do not.

### a. Gant

In *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court recognized that "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Id.* at 335. The Court's conclusion, which built upon the so-called search-incident-to-arrest exception to the warrant requirement, allows a law-enforcement officer to search a vehicle's passenger compartment and any containers found within that compartment without a warrant when: (1) the officer has "lawful[ly]" arrested a recent occupant of the vehicle; and (2) it is objectively reasonable for the officer to believe that evidence of the offense for which the occupant was arrested might be found within the passenger compartment. *Id.* at 343–44 (noting that "the offense of arrest . . . suppl[ies] a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein").

The first question under *Gant* is therefore whether Defendant was lawfully arrested for suspicion of having discharged a firearm within Raleigh's city limits, a violation of Raleigh's Code of Ordinances § 13-

7

2010(a) (the "Ordinance").[3] The Ordinance, which the City of Raleigh was authorized to implement and enforce pursuant to N.C. Gen. Stat. § 160A-189 (granting cities the authority to "regulate, restrict, or prohibit the discharge of firearms at any time or place within the city"), makes it "unlawful for any *person* to shoot or discharge within the corporate limits of the *City* [of Raleigh], any air rifle, gun or pistol, or any spring gun, pistol, or other similar device which impels with force any shot or pellet of any kind." Raleigh Code of Ordinances § 13-2010(a) (emphasis in original) (available at https://library.municode.com/nc/raleigh/codes/code_of_ordinances (last accessed March 17, 2021)). In order to lawfully arrest Defendant for having violated the Ordinance without an arrest warrant, the officers must have had "probable cause" to believe that Defendant had violated the Ordinance within the meaning of the Fourth Amendment. *United States v. Williams*, 10 F.3d 1070, 1073 (4th Cir. 1993) ("Police officers can make warrantless arrests as long as they act on the basis of probable cause."). The Supreme Court has defined probable cause as follows:

> "[P]robable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The Court has also said that "an arrest with or without a warrant must stand upon firmer ground than mere suspicion, though the arresting officer need not have in hand evidence which would suffice to convict." *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (internal citation omitted). The burden of demonstrating probable cause is on the Government. *See United States v. Mubdi*, 691 F.3d 334, 341 n.7 (4th Cir. 2012) (noting that "[t]he government's probable cause burden requires no more than a reasonable ground to believe that an offense has been committed, a standard

---

[3] Defendant's arrest for resisting law enforcement is not relevant to a *Gant* analysis, since no evidence that Defendant resisted law enforcement could reasonably be expected to be found within Defendant's vehicle. *See Gant*, 556 U.S. at 343 ("In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence.").

8

far less exacting than that imposed on the government to prove guilt beyond a reasonable doubt"), *vacated on other grounds*, 570 U.S. 913 (2013).

The testimonial and video evidence presented to the court demonstrate that the facts and circumstances within Keeny's knowledge at the time that he arrested Defendant were sufficient to warrant a person of reasonable caution in believing, under the circumstances, that Defendant had discharged a firearm within Raleigh's city limits. Keeny testified that heard the first round of gunshots at Durant Road Elementary School and canvassed the surrounding area in his patrol vehicle for five to ten minutes, during which he encountered no other individuals or vehicles. [DE-37 at 6, 18, 36] This was unsurprising, given the late hour and the restrictions that were in effect due to the COVID-19 outbreak.[4] Then, while Keeny was in the parking lot of nearby Abbotts Creek Elementary School—in the middle of the night[5]—Keeny heard a second series of gunshots very close by, and immediately observed Defendant's vehicle within 100 yards of him in the direction from which the gunfire was heard, rapidly performing an unorthodox driving maneuver and then speeding away. [DE-37 at 6, 19–20; DE-24 at 2; DE-30 at 2] Keeny observed no individuals or vehicles other than Defendant's vehicle in the area near the school. [DE-37 at 7] A high-speed chase then ensued, with Defendant driving in a manner that, in Keeny's experience, was consistent with behavior intended to evade law enforcement. [DE-37 at 8–9; DE-36 (Keeny Vehicle)] Once Keeny caught up with Defendant's vehicle, it had darted down side streets and come to a stop in what Keeny believed was a random driveway, all of which Keeny testified was behavior consistent with evading law

---

[4] *See supra* note 2.

[5] The court notes that observing a vehicle at an elementary school in the middle of the night is always itself cause for some amount of suspicion, but observing Defendant's vehicle there on the night in question would have been particularly suspicious to Keeny given that, at the time, North Carolina's Governor had shuttered the state's public elementary schools, like Abbotts Creek, in response to the COVID-19 outbreak. *See* N.C. Exec. Order 120 (Mar. 23, 2020) (closing K-12 public schools statewide through May 15, 2020) (available at https://governor.nc.gov/documents/executive-order-no-120 (last accessed Mar. 17, 2021)).

enforcement. [DE-37 at 8–9; DE-36 (Keeny Vehicle)] Keeny's dashboard-camera video shows no other individuals or vehicles visible en route to the scene of the arrest. [DE-36 (Keeny Vehicle)] And finally, once Keeny pulled up behind Defendant's vehicle, turned on his emergency lights, and approached Defendant's vehicle, Defendant exited the vehicle, walked towards Keeny, acted agitated, and resisted Keeny's lawful commands to place his hands onto the vehicle.[6] [DE-37 at 9–11; DE-36 (Keeny Vehicle)] Only after all of the foregoing was Defendant placed under arrest. [DE-36 (Keeny Vehicle)]

While Keeny did not testify that he was an eyewitness to the discharge of a firearm, the court concludes that the facts described above provided Keeny with reason to believe, under the circumstances, that Defendant had discharged a firearm from his vehicle at Abbotts Creek Elementary School in Raleigh on the night of his arrest. *See United States v.7715 Betsy Bruce Lane*, 906 F.2d 110, 113 (4th Cir. 1990) ("Probable cause can be established on the basis of . . . circumstantial evidence[.]" (internal quotation marks and citation omitted)); *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127 (2d Cir. 2009) ("Given the undisputed facts here that shots were suddenly fired, that [the arresting officer] saw [the plaintiff's son] when he looked in the direction from which the shots had been fired, that [the plaintiff's son] was standing alone, and that [the plaintiff's son] promptly turned around and proceeded [in the direction from which the shots had been fired], we conclude that there was probable cause for [the arresting officer] to believe that [the plaintiff's son] was the person who had fired the shots--whether or not [the arresting officer] actually saw a gun."). The court therefore concludes that Keeny had probable cause to

---

[6] *See Terry v. Ohio*, 392 U.S. 1, 24 (1968) ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.").

10

arrest Defendant for suspicion of having violated the Ordinance, and Defendant's arrest for doing so was lawful within the meaning of *Gant*. *Williams*, 10 F.3d at 1073.

Having concluded that Defendant's arrest was lawful, the remaining question under *Gant* is whether it was reasonable to believe that evidence that Defendant had discharged a firearm within Raleigh's city limits might be found within the passenger compartment of Defendant's vehicle. 556 U.S. at 343–44. The court concludes that such a belief was reasonable. Again, Keeny testified that he heard a series of gunshots very close by and immediately observed Defendant's vehicle within 100 yards of him in the direction from which he had heard the gunfire. [DE-37 at 6, 18–20] Keeny also testified that he saw no individuals or vehicles in the area near where he heard the gunfire other than Defendant's vehicle, and that he chased Defendant's vehicle—which had a "distinctive brake-light pattern"—to the site of Defendant's arrest. [DE-37 at 6–9, 22] And Keeny's dashboard-camera video shows that at the time Keeny pulled up behind Defendant's vehicle and activated his emergency lights, Defendant was still inside his vehicle. [DE-36 (Keeny Vehicle)] Taken together, these facts made it reasonable for the officers to believe that evidence that Defendant discharged a firearm at the school—most logically, a firearm and spent shell casings—might be found within Defendant's vehicle, and satisfies the second *Gant* factor.

Moreover: (1) while Defendant was being secured in the back of Keeny's patrol vehicle and Garrison was surveying the scene for danger, Garrison observed shell casings on the back seat of Defendant's vehicle [DE-36 (Garrison Body); DE-37 at 11–12]; and (2) Warren later observed more shell casings in the front passenger area of the vehicle while the officers were trying to ascertain whether other people were at the house in front of which the vehicle was parked [DE-36 (Warren Body); DE-37 at 41]. The fact that the officers observed shell casings in Defendant's vehicle in plain view while they were in the process of arresting Defendant and securing the area—and thus in a lawful position to observe the shell casings—makes it not only reasonable to believe that evidence tending to show that Defendant had been

11

discharging a firearm *might* be found within Defendant's vehicle as *Gant* requires, but makes finding such evidence a certainty. *See Maryland v. Buie*, 494 U.S. 325, 330–35 (1990) (promulgating protective-sweep doctrine; stating that "arresting officers are permitted [where they have a reasonable concern for their safety based upon specific and articulable facts] to take reasonable steps to ensure their safety after, and while making, the arrest"; and noting that the seizure of objects seen in plain view during a protective sweep does not offend the Fourth Amendment); *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) (discussing and upholding applicability of protective-sweep doctrine where the defendant was arrested outside of a home and a firearm was unaccounted for); *Texas v. Brown*, 460 U.S. 730, 735–44 (1983) (discussing plain-view doctrine and noting that use of a flashlight does not impact analysis); *infra* Section II(b)(2) (discussing import of fact that Defendant's vehicle was parked on his parents' property).

Because both *Gant* factors are satisfied, the court concludes that the officers were justified in "searching the passenger compartment of [Defendant]'s vehicle and any containers therein" for evidence that Defendant had discharged a firearm within Raleigh's city limits as a reasonable search incident to Defendant's arrest on suspicion for having done so. 556 U.S. at 343–44. Thus, while it might have been preferable for the officers to obtain a search warrant from a magistrate before entering the passenger compartment of Defendant's vehicle, the Fourth Amendment did not require that the officers do so. Accordingly, any evidence found within the passenger compartment of Defendant's vehicle or any containers within that compartment will not be suppressed on Fourth Amendment grounds.

However, the officers also searched the trunk of Defendant's vehicle. [DE-36 (Keeny Vehicle)] As mentioned above, *Gant* provides that a lawful arrest of a recent occupant of a vehicle can "supply a basis for searching *the passenger compartment* of an arrestee's vehicle and any containers therein." 556 U.S. at 344 (emphasis added). *Gant* does not say that such an arrest provides a justification for a warrantless search of the trunk of an arrestee's vehicle, and the court concludes based upon the evidence presented that the

12

officers were not otherwise justified in searching Defendant's trunk without first obtaining a search warrant. Because the officers searched the trunk before obtaining a warrant, any evidence found within the trunk of Defendant's vehicle must be suppressed.

### b.  *Other considerations*

Having disposed of Defendant's motion to suppress, the court moves on to the potentially-complicating considerations raised by Defendant and explains why they do not change the result.

### 1.  Defendant was secured in Keeny's patrol vehicle at the time of the search

Defendant argues that the officers were not justified in searching Defendant's vehicle without a warrant pursuant to the search-incident-to-arrest exception once Defendant was secured in the back of Keeny's patrol vehicle. [DE-24 at 15–18]  Defendant argues that "[t]he Court in *Gant* clarified the scope of the search of a vehicle incident-to-arrest by holding 'that the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'" [DE-24 at 16 (quoting *Gant*, 556 U.S. at 343)]  Because it is undisputed that Defendant was secured in the back of Keeny's patrol vehicle at the time that the officers searched his vehicle, Defendant argues that the search of his vehicle was unjustifiable under *Chimel* and *Gant*. [DE-24 at 15]

Defendant is correct that *Chimel v. California*, 395 U.S. 752 (1969), does not justify the search of Defendant's vehicle, because Defendant was secured and unable to reach his vehicle at the time that it was searched.  As noted by the *Gant* Court:

> Because Gant could not have accessed his car to retrieve weapons or evidence at the time of the search, the Arizona Supreme Court held that the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement, as defined in *Chimel* . . . and applied to vehicle searches in *New York* v. *Belton*, 453 U.S. 454 (1981), did not justify the search in this case.  We agree with that conclusion.
>
> Under *Chimel*, police may search incident to arrest only the space within an

13

arrestee's immediate control, meaning the area from within which he might gain possession of a weapon or destructible evidence. The safety and evidentiary justifications underlying *Chimel*'s reaching-distance rule determine *Belton*'s scope. Accordingly, we hold that *Belton* does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle.

*Gant*, 556 U.S. at 335 (internal quotation marks and citations omitted).

But *Chimel* does not control the court's conclusion that the search of Defendant's vehicle was a lawful search incident to arrest under *Gant*. Immediately following the passage quoted above, the *Gant* Court also recognized the rule discussed by the court above in Section II(a), which is based upon another case, *Thornton v. United States*, 541 U.S. 615 (2004):

Consistent with the holding in *Thornton* . . . and following the suggestion in Justice Scalia's opinion concurring in the judgment in that case, we also conclude that circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle.

*Gant*, 556 U.S. at 335 (citations omitted); *see Thornton*, 541 U.S. at 632 (Scalia, J., concurring in the judgment) ("I would . . . limit *Belton* searches to cases where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."). Rather than *Chimel*, it is upon this rule (hereinafter, the "*Thornton* rule") that the court's ruling is based. *See supra* Section II(a).

Under the *Thornton* rule, the fact that Defendant was secured within Keeny's patrol vehicle is not relevant. Discussing the *Thornton* rule, the *Gant* Court said:

In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others, including *Belton* and *Thornton*, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein.

556 U.S. at 343–44 (internal citations omitted). By indicating that the *Thornton* defendant's arrest would have been sufficient to justify the search of his vehicle incident to that arrest under the *Thornton* rule, the

14

*Gant* Court made clear that it would reject Defendant's argument here, since the search challenged in *Thornton* took place while the defendant was secured in the back of the arresting officer's patrol vehicle. *Thornton*, 541 U.S. at 618 (noting that the arresting officer "handcuffed [the defendant], informed him that he was under arrest, and placed him in the back seat of the patrol car. He then searched [the defendant]'s vehicle and found a BryCo .9-millimeter handgun under the driver's seat."). The court therefore concludes that the fact that Defendant was secured in the back of Keeny's patrol vehicle while his vehicle was searched does not change the court's conclusion that the search was lawful under *Gant* and the *Thornton* rule.[7]

      2. <u>Defendant was parked on his parents' driveway</u>

Defendant also argues that the officers were prohibited from searching Defendant's vehicle without a warrant once the vehicle made it to his parents' property. [DE-24 at 18–24] Defendant argues that the driveway upon which his vehicle was parked was part of the curtilage of his parents' home and that he therefore had a reasonable and elevated expectation of privacy in the driveway that the officers were not allowed to invade without a warrant. [DE-24 at 18–24] Defendant's argument fails for a number of reasons.

First, Defendant argues that "[t]his case, as in *Collins v. Virginia*, [138 S. Ct. 1663 (2018)] 'arises at the intersection of two components of the Court's Fourth Amendment jurisprudence: the automobile exception to the warrant requirement and the protection extended to the curtilage of a home.'" [DE-24 at 19 (quoting *Collins*, 138 S. Ct. at 1669)] Defendant argues that, under the automobile exception, the officers were not allowed to enter the curtilage of his parents' home to search his vehicle. [DE-24 at 19–24]

---

[7] Defendant also argues that a lack of probable cause sufficient to arrest Defendant for the discharging-a-firearm offense rendered the search impermissible under the *Thornton* rule [DE-24 at 17–18], but for the reasons described above in Section II(a), the court disagrees that the officers lacked probable cause to arrest Defendant on that basis.

15

While the *Collins* Court did hold that "the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein[,]" 138 S. Ct. at 1675, *Collins* does not control this case. *Collins* involved neither: (1) an exigent circumstance, like a hot pursuit from a public place (*see infra*); nor (2) an arrest, both of which took place in this case. *See id.* ("We leave for resolution on remand whether Officer Rhodes' warrantless intrusion on the curtilage of Collins' house may have been reasonable on a different basis, such as the exigent circumstances exception to the warrant requirement."). Because *Collins* did not involve an arrest, it did not implicate the search-incident-to-arrest exception or the *Thornton* rule described in *Gant*, which the court concludes justified the search of Defendant's vehicle. *See supra* Section II(a). Rather, *Collins* describes the automobile exception alone, which is a different Fourth Amendment exception upon which the court does not rely in its ruling, and which the court therefore need not analyze.

Defendant also argues that the curtilage issue renders the search-incident-to-arrest exception inapplicable. [DE-24 at 24] Were a ruling on the curtilage issue required, the court would be inclined to rule that Defendant has failed carry his burden of proving that his parents'[8] driveway qualifies as curtilage of their home. "In order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a legitimate expectation of privacy in the invaded place." *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotation marks and citations omitted). The Supreme Court has said:

> [T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the

---

[8] The parties do not argue, and the court does not conclude, that the fact that Defendant was not the lawful owner of the home is relevant to the curtilage issue. *See Bumper v. North Carolina*, 391 U.S. 543, 548 n.11 (1968) (holding that an unreasonable search of a grandmother's house violated her resident grandson's Fourth Amendment rights because "the house searched was his home" for Fourth Amendment purposes); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place").

16

home itself . . . the central component of this inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.

. . .

[C]urtilage questions should be resolved with particular reference to four factors:

> [1] the proximity of the area claimed to be curtilage to the home,
>
> [2] whether the area is included within an enclosure surrounding the home,
>
> [3] the nature of the uses to which the area is put, and
>
> [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 300–01 (1987) (internal quotation marks and citations omitted).

Despite having the burden of proof, Defendant makes no meaningful argument regarding why the driveway qualifies as curtilage beyond the undisputed fact that it is adjacent to the home. [DE-24 at 18–24] There is no bright-line rule that that a driveway qualifies as curtilage for Fourth Amendment purposes, and as mentioned above, proximity to the home is only one of several factors that courts take into account in determining whether an area qualifies as curtilage. *Id.* The video evidence submitted by the parties demonstrates that beyond (1) proximity to the home, none of the other factors support a conclusion that the driveway in question qualifies as curtilage: (2) the driveway is not enclosed; (3) the driveway appears used primarily as an area upon which to park vehicles (or drive cars into the garage, which *is* enclosed); and (4) no steps appear to have been taken to protect the driveway from the observations of passersby. [DE-36 (Keeny Vehicle)] Furthermore, regarding the third factor, the video evidence demonstrates that a visitor approaching the front door of the house would have to walk upon the driveway where Defendant's vehicle was parked in order to knock on the front door of the house. [DE-36 (Keeny Vehicle)] The Supreme Court has recognized an "implicit license [that] typically permits [a] visitor to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave[,]" and

17

has accordingly concluded that "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (internal quotation marks and citations omitted). The fact that both private visitors and law-enforcement officers would be lawfully permitted to walk upon the part of the driveway upon which Defendant's vehicle was parked strongly cuts against finding that the driveway "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life[,]" *Dunn*, 480 U.S. at 300 (internal quotation marks and citations omitted), and thus against finding that the driveway qualifies as curtilage. *See Oliver v. United States*, 466 U.S. 170, 180 (1984) ("[C]ourts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Conversely, the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields." (internal citations omitted)). For these reasons, as mentioned above, the court would be inclined to rule that Defendant has failed to carry his burden of proving that his vehicle was searched within the curtilage of his parents' home, were such a ruling required.

But the court need not rule upon the curtilage issue. Even assuming *arguendo* that the driveway qualifies as curtilage, the court concludes that the officers were justified in entering the curtilage to effect Defendant's arrest and, therefore, to conduct a search of Defendant's vehicle for evidence that Defendant had discharged a firearm within Raleigh's city limits under *Gant* and the *Thornton* rule.

In *United States v. Santana*, 427 U.S. 38 (1976), police officers had probable cause to arrest the defendant for selling drugs, and upon arriving at the defendant's house the officers: (1) observed the defendant on her front porch; (2) identified themselves as police officers; and (3) followed the defendant into her house when she retreated there. *Id.* at 39–41. Inside the house, the police arrested the defendant

18

and conducted a search of her person incident to the arrest, finding drugs and marked drug money. *Id.* The police did all of the aforementioned without obtaining a warrant authorizing either the arrest or the search. *Id.*

On appeal, the *Santana* Court upheld both the arrest and the search incident thereto because the Court concluded that: (1) the defendant's front porch was a public place for Fourth Amendment purposes; and (2) the police engaged in "hot pursuit" of the defendant from the porch to place her under arrest. *Id.* at 42–43. The Court clarified that "'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry in and about the public streets." *Id.* (internal quotation marks and brackets omitted). Thus, under *Santana*, to lawfully arrest a suspect within their home—and thus, *a fortiori*, within the curtilage thereof—all that is necessary is that the police: (1) have probable cause to arrest a suspect in a public place; and (2) engage in "some sort of a chase" of the suspect from that place to the home. *Id.* Put another way, once a hot pursuit to effect a lawful warrantless arrest is underway in a public place, the fact that the defendant makes it to private property before being arrested cannot defeat the arrest. *Id.* at 43 ("a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place").

Here, because: (1) Keeny had probable cause to arrest Defendant for discharging a firearm within Raleigh's city limits before Defendant pulled into his parents' driveway, *see supra* Section II(a); and (2) Keeny pursued Defendant in a high-speed chase from a public place to the driveway, the fact that Defendant's arrest took place on private property—curtilage or otherwise—is insufficient to defeat Defendant's lawful warrantless arrest. *Santana*, 427 U.S. at 42–43.

The court's independent research has uncovered no authority in which *Gant* and the *Thornton* rule has been held applicable or inapplicable to searches conducted incident to a defendant's arrest within the curtilage of the defendant's home. And it is true that the Supreme Court has recognized a difference in the

19

expectation of privacy accorded to a vehicle that is traveling or parked in public on the one hand, and that accorded to a vehicle parked on its owner's property on the other. *See Cardwell v. Lewis*, 417 U.S. 583, 593 (1974) (plurality opinion). However, the Court has also indicated that the elevated expectation of privacy accorded to a vehicle parked on the driver's property does not render unlawful a warrantless search of the vehicle incident to the arrest of the driver when the vehicle is pursued from a public place by officers having probable cause to arrest the driver.

In *Scher v. United States*, 305 U.S. 251 (1938), police officers were pursuing a vehicle that they had probable cause to believe contained illegal liquor when the vehicle turned into a garage within the curtilage of a home, which turned out to belong to the driver of the vehicle. *Id.* at 253. One of the officers entered the garage on foot and approached the driver, announced that he was a police officer, and stated that he suspected the vehicle of carrying illegal liquor. *Id.* The driver admitted to having liquor in the trunk, and the officer opened the trunk and found the liquor there. *Id.*

The driver later moved to suppress the liquor, arguing that the warrantless search in his own garage violated his Fourth Amendment rights, and the case made it to the Supreme Court. *Id.* at 254. The Court held:

> [I]t seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest.
>
> . . .
>
> Passage of the car into the open garage closely followed by the observing officer did not destroy this right. No search was made of the garage. Examination of the automobile accompanied an arrest, without objection and upon admission of probable guilt. The officers did nothing either unreasonable or oppressive. *Agnello v. United States*, 269 U.S. 20, 30 [(1925); *Wisniewski v. United States*, 47 F.2d 825, 826 [(6th Cir. 1931)].

*Id.* at 255. The *Scher* Court therefore concluded that where a vehicle is pursued in public by officers with probable cause to arrest the driver, the officers may arrest the driver and perform an "accompan[ying]"

20

search of the vehicle despite the fact that the vehicle entered the curtilage of a private home prior to the arrest and search. *Id.*; *see United States v. Newbourn*, 600 F.2d 452, 457 (4th Cir. 1979) (noting that "[e]ven if the vehicle is parked on the private property of its owner when searched, a warrant is not a prerequisite if it got there only after close pursuit." (citing *Scher*)).

*Scher* was recently discussed in *Collins v. Virginia*, 138 S. Ct. 1663 (2018), where the Court said that "*Scher*'s reasoning . . . was both case specific and imprecise, sounding in multiple doctrines, particularly, and perhaps most appropriately, hot pursuit." *Id.* at 1674. *Collins* did not overrule *Scher*, but concluded that "[t]he decision is best regarded as a factbound one[.]" *Id.* A question is therefore whether factual differences render *Scher* inapposite here.

There are two salient facts potentially distinguishing this case from *Scher*. First, Defendant objected to the search of his vehicle, while the *Scher* driver simply made no objection to the search. And second, Defendant did not admit, prior to the officers' search of his vehicle, that it contained anything, while the *Scher* driver admitted that his vehicle contained illegal liquor. [DE-36 (Keeny Vehicle)]; *Scher*, 305 U.S. at 255 ("Examination of the automobile accompanied an arrest, without objection and upon admission of probable guilt.").

Neither of these differences diminish *Scher*'s precedential value here. Importantly, the *Scher* Court noted that (1) "it seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest" and that (2) "[p]assage of the car into the open garage closely followed by the observing officer did not destroy this right." *Id.* Accordingly, the officers in *Scher* had probable cause to arrest the driver *before* the driver failed to object and admitted to possessing the liquor, and it was that lawful arrest which justified the subsequent search of the vehicle, i.e., as a lawful search incident to an arrest. *Id.* ("Examination of the automobile accompanied an arrest"). Indeed, on the page cited by the *Scher* Court, the *Agnello* Court said:

21

> The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted.

269 U.S. at 30; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 459 n.17 (1971) (describing *Scher* and implying that it is a search-incident-to-arrest case by virtue of its invocation of *Agnello*). Accordingly, neither the driver's failure to object to the search nor his admission were necessary to render lawful the search in *Scher*,[9] and precedent does not lose its persuasive weight because of immaterial considerations.

The reason that the arrest and search incident thereto were lawfully effected on the *Scher* driver's property, of course, was that the defendant was "closely followed by the observing officer" from public, *Scher*, 305 U.S. at 255, i.e., because the officers were in hot pursuit of the driver from a public place. As discussed above, the *Santana* Court expressly held that "a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place[,]" 427 U.S. at 43, and *Scher* stands for the proposition that the hot-pursuit doctrine also applies to searches incident to such arrests. Further, *Collins* did not overrule *Scher*, but instead appears to suggest that the search in *Scher* was justified by the hot-pursuit doctrine. *Collins*, 138 S. Ct. at 1674 ("*Scher*'s reasoning . . . sound[ed] in multiple

---

[9] That the *Scher* driver's failure to object and admission were unnecessary to the lawfulness of the search makes sense, for two reasons. First, while a defendant's affirmative consent to a search can render an otherwise-unlawful search lawful, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("a search authorized by consent is wholly valid"), a defendant's failure to object to an unlawful search does not render the search lawful, *see Bumper*, 391 U.S. at 548–49 ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."). And second, while a defendant's admission of criminal activity is evidence that supports probable cause, it is plainly not necessary to establish probable cause. *Mubdi*, 691 F.3d at 341 n.7 ("The government's probable cause burden requires no more than a reasonable ground to believe that an offense has been committed[.]"). Since the officers in *Scher* already had probable cause to support an arrest, the driver's admission merely strengthened the justifications for an already-lawful arrest, and thus the search incident thereto.

doctrines, *particularly, and perhaps most appropriately, hot pursuit*." (emphasis added)); *see also Luer v. Clinton*, 987 F.3d 1160, 2021 U.S. App. LEXIS 4265, at *6 (8th Cir. Feb. 16, 2021) (recognizing hot-pursuit doctrine after *Collins*); *United States v. Shelton*, No. 18-2045 KG, 2018 U.S. Dist. LEXIS 197713, at *25–27 (D.N.M. Nov. 20, 2018) (applying hot-pursuit doctrine after *Collins*).

In light of the foregoing, the court reads *Scher* as holding that a vehicle can be lawfully searched incident to the arrest of a recent occupant thereof where, following hot pursuit from a public place, the vehicle ends up in the curtilage of the occupant's home prior to the arrest. In such circumstances, following *Gant* and the *Thornton* rule, such a search is lawful so long as "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."[10] *Gant*, 556 U.S. at 335. Assuming *arguendo* that Defendant's parents' driveway qualifies as curtilage of their home, that is the precisely the challenged search before the court. And following *Gant* and *Scher*,[11] the court concludes that Keeny's hot pursuit of Defendant's vehicle from a public place would render irrelevant the fact that Defendant's vehicle was searched within the curtilage of the home, if Defendant had carried his burden of proving that fact.

In sum, for the aforementioned reasons, the court's conclusion regarding the evidence subject to suppression discussed above in Section II(a) is unaffected by the complicating considerations raised by Defendant.

---

[10] Although the *Scher* Court cited *Agnello*, which stands for the proposition that searches incident to arrest are justified where they seek either to find and seize (1) "things connected with the crime as its fruits or as the means by which it was committed" or (2) "weapons and other things to effect an escape from custody[,]" *Agnello*, 269 U.S. at 30, a search of a vehicle incident to an arrest undertaken only to find "weapons and other things to effect an escape from custody" would now be justified only under *Chimel*, and only where the arrestee is unsecured or able to access the interior of the vehicle. *See Gant*, 556 U.S. at 335. But since reasonably searching an arrestee's vehicle for the evidence of the crime of arrest is contemplated by *Gant* and the *Thornton* rule, that aspect of *Agnello* (and, by extension, *Scher*) remains persuasive.

[11] To the extent *Scher* is not controlling, the court nonetheless finds it persuasive, and that it supports the court's conclusion that *Gant* and the *Thornton* rule apply to warrantless searches of vehicles conducted incident to the arrest of a recent occupant following hot pursuit from a public place, regardless of whether the search is conducted within the curtilage of the occupant's home.

23

### III. Conclusion

The court ends where it began. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'" *Brigham City*, 547 U.S. at 403. For the foregoing reasons, the court concludes that the officers' warrantless search of the passenger compartment of Defendant's vehicle was reasonable, and the warrantless search of the trunk was unreasonable, within the meaning of the Fourth Amendment.

Defendant's motion to suppress is therefore (1) GRANTED as to any evidence retrieved from the trunk of Defendant's vehicle and (2) DENIED as to any evidence retrieved from the passenger compartment of his vehicle, or any containers therein. Evidence retrieved from the trunk will accordingly be SUPPRESSED, and the Government may not use that evidence in its case-in-chief. *See United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015) ("Where it applies, the exclusionary rule prohibits the government from introducing in its case in chief evidence obtained in violation of the Fourth Amendment."). Any evidence that was not "seized from the vehicle driven by Defendant" [DE-24 at 1], such as the magazine recovered from Defendant's person and Defendant's statements, is not challenged by Defendant's motion to suppress, and is not affected by this order.

SO ORDERED this the ___18th___ day of ___March___, 2021.

_Richard E Myers II_
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

24